UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

JEREMY SIMMONS-TELEP, individually )
and on behalf of all others similarly situated, )
                                               )
                        Plaintiff,             )   Case No. 1:20-cv-00226-JJM-LDA
                                               )
            v.                                 )
                                               )
ROGER WILLIAMS UNIVERSITY,                     )
                                               )
                        Defendant.

**ROGER WILLIAMS UNIVERSITY'S REPLY MEMORANDUM
<u>IN SUPPORT OF MOTION TO DISMISS THE AMENDED COMPLAINT</u>**

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................................................1

I.     SIMMONS-TELEP FAILS TO REBUT THE EDUCATIONAL
MALPRACTICE AND ACADEMIC FREEDOM BARS TO HIS CLAIMS ..................2

     A.    The Educational Malpractice Bar Applies ................................................2

     B.    The Academic Freedom Bar Applies .......................................................6

II.    SIMMONS-TELEP FAILS TO OVERCOME THE LEGAL DEFICIENCIES IN
HIS CONTRACT CLAIMS ...........................................................................................7

     A.    Simmons-Telep Fails To Allege Any Contract Term Requiring
Exclusively In-Person Education .............................................................7

     B.    Undefined "Experiences" Are Too Vague To Form The Basis Of A
Contract ..................................................................................................11

     C.    Simmons-Telep Fails To Allege Any Facts That Would Support A
Reasonable Expectation Of In-Person Education During A Pandemic ...12

     D.    The Deference Afforded Universities Concerning Methods of Instruction
Should Inform Interpretation of Any Contract Here ...............................15

III.   SIMMONS-TELEP FAILS TO OVERCOME THE DEFICIENCIES IN HIS
UNJUST ENRICHMENT CLAIMS .............................................................................16

CONCLUSION ...............................................................................................................19

## **TABLE OF AUTHORITIES**

**Page(s)**

### **Cases**

*Ambrose v. New England Ass'n of Sch. & Colleges, Inc.*,
  252 F.3d 488 (1st Cir. 2001) ....................................................................... 2, 3, 6

*Bahrani v. Northeastern Univ.*,
  Case No. 1:20-cv-10946, Dkt. 39 (D. Mass. Nov. 6, 2020) ..................................... 8

*Bleiler v. Coll. of Holy Cross*,
  No. 11-11541-DJC, 2013 WL 4714340 (D. Mass. Aug. 26, 2013) ......................... 18

*CenCor, Inc. v. Tolman*,
  868 P.2d 396 (Colo. 1994) ......................................................................................... 5

*Chong v. Northeastern Univ.*,
  2020 WL 5847626 (D. Mass. Oct. 1, 2020) .............................................................. 8

*Cuesnongle v. Ramos*,
  713 F.2d 881 (1st Cir. 1983) .............................................................. 13, 14, 15, 18

*D'Oliveira v. Rare Hosp. Int'l, Inc.*,
  840 A.2d 538 (R.I. 2004) ......................................................................................... 14

*David v. Neumann Univ.*,
  177 F. Supp. 3d 920 (E.D. Pa. 2016) ........................................................................ 9

*Doyle v. Hasbro, Inc.*,
  103 F.3d 186 (1st Cir. 1996) ..................................................................................... 7

*Driscoll v. Bryant Univ.*,
  393 F. Supp. 3d 153 (D.R.I. 2019) .......................................................................... 16

*G. v. Fay Sch.*,
  931 F.3d 1 (1st Cir. 2019) .............................................................................. 7, 9, 12

*Gally v. Columbia Univ.*,
  22 F. Supp. 2d 199 (S.D.N.Y. 1998) .................................................................... 4, 6

*Gillis v. Principia Corp.*,
  832 F.3d 865 (8th Cir. 2016) .................................................................................... 3

*Gorman v. St. Raphael Acad.*,
  853 A.2d 28 (2004) ......................................................................................... passim

*Haddad v. Bryant Univ.*,
  No. CV 18-314-JJM-PAS, 2019 WL 3084352 (D.R.I. July 15, 2019) ...................... 4

*Half Moon Ventures, LLC v. Energy Development Partners, LLC*
  No. CV 18-685-JJM-PAS, 2019 WL 2176308 (D.R.I. May 20, 2019) .................... 16

*Hebert v. Vantage Travel Serv., Inc.*,
   444 F. Supp. 3d 233 (D. Mass. 2020) ....................................................................... 14

*J.P. Morgan Chase Bank, N.A. v. Leigh*,
   No. CA 11-246ML, 2011 WL 4351584 (D.R.I. Aug. 23, 2011) ............................... 17

*Jacobowitz on behalf of MJ v. YMCA of Greater Providence Bayside YMCA Branch*,
   No. CV 15-345 S, 2016 WL 1259397 (D.R.I. Mar. 30, 2016) .................................. 12

*Johnson v. Schmitz*,
   119 F. Supp. 2d 90 (D. Conn. 2000) ........................................................................... 5

*Kashmiri v. Regents of Univ. of California*,
   67 Cal. Rptr. 3d 635 (Cal. Ct. App. 2007) ................................................................. 5

*Lyons v. Salve Regina Coll.*,
   565 F.2d 200 (1st Cir. 1977) ..................................................................................... 12

*Mangla v. Brown Univ.*,
   135 F.3d 80 (1st Cir. 1998) ................................................................................. 12, 16

*Paynter v. New York Univ.*,
   319 N.Y.S.2d 893 (1971) ...................................................................................... 13, 16

*Pickett v. Ditech Fin., LLC*,
   322 F. Supp. 3d 287 (D.R.I. 2018) ........................................................................... 16

*Roe v. Loyola Univ. New Orleans*,
   No. 07–1828, 2007 WL 4219174 (E.D. La. Nov. 26, 2007) ....................... 13, 16, 17

*Rosado v. Barry Univ.*
   No. 1:20-CV-21813-JEM, 2020 WL 6438684 (S.D. Fla. Oct. 30, 2020) ................ 18

*Ross v. Creighton Univ.*,
   957 F.2d 410 (7th Cir. 1992) ....................................................................................... 5

*Schaer v. Brandeis Univ.*,
   735 N.E.2d 373 (Mass. 2000) ...................................................................................... 2

*Sweezy v. New Hampshire*,
   354 U.S. 234 (1957) ...................................................................................................... 6

*Turcott v. Gilbane Bldg. Co.*,
   179 A.2d 491 (R.I. 1962) ...................................................................................... 7, 11

*Vurimindi v. Fuqua Sch. of Bus.*,
   435 Fed.Appx. 129 (3d Cir. 2011) ........................................................................ 9, 12

*Ward v. New York Univ.*,
   2000 WL 1448641 (S.D.N.Y. Sept. 28, 2000) ............................................................ 9

*Zinter v. Univ. of Minnesota*,
   799 N.W.2d 243 (Minn. App. 2011) ......................................................................... 17

*Zumbrun v. Univ. of S. Cal.*,
   101 Cal. Rptr. 499 (Cal. Ct. App. 1972) ............................................................ 5

## **Other Authorities**

Restatement (Second) of Contracts § 33(2) (1981) ...................................................... 11

Restatement (Third) of Restitution and Unjust Enrichment § 2 (2011)........................................ 16

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, defendant Roger Williams University ("RWU or the "University") respectfully submits this memorandum in further support of its Motion to Dismiss.

## INTRODUCTION

Plaintiff's opposition (Dkt. 24 (Opp.)) fails to overcome the arguments in the University's motion to dismiss, or the fundamental deficiencies in the Amended Complaint. Plaintiff does not identify any contractual promise requiring in-person instruction or student services. Rather, he continues to rely on statements from RWU's academic catalog that have no bearing on the form of instruction offered. Even assuming promotional statements on a university website could form the basis of a contract, the language plaintiff cites does not specify any particular form of instruction or services. Recognizing these fatal deficiencies, plaintiff now attempts to re-frame his suit as based on the nebulous—and unpleaded—benefits of an "on-campus educational experience." But RWU did not promise those benefits either, nor could such an indefinite concept form the basis of an enforceable contract or other claim.

Moreover, the opposition entirely ignores governing Rhode Island law requiring courts to construe educational contracts "in a manner that leaves the school administration broad discretion" and "flexibility to meet its educational responsibilities." *Gorman v. St. Raphael Acad.*, 853 A.2d 28, 24 (2004). Here, the University soundly exercised that discretion to protect the health and safety of its students while also meeting its educational responsibilities. Because the University continued to provide remote instruction in all classes, for uninterrupted progress towards students' degrees, the adjudication of plaintiff's claims would necessarily require the evaluation of the quality of instruction provided. That inquiry is precisely what educational malpractice and academic freedom precedents preclude.

1

Defendant's motion to dismiss should be granted.

## I.   SIMMONS-TELEP FAILS TO REBUT THE EDUCATIONAL MALPRACTICE AND ACADEMIC FREEDOM BARS TO HIS CLAIMS

### A.   The Educational Malpractice Bar Applies

Contrary to plaintiffs' argument (Opp. 8) that Rhode Island law does not recognize a bar to "educational malpractice," Rhode Island courts have clearly endorsed the same principle with or without that exact label. *See* Mot. 2 ("Many jurisdictions have characterized the principles articulated in *Gorman* as a bar to claims of 'educational malpractice'—i.e., impermissible attempts to have courts second-guess the quality or value of a university's educational offerings"). Notably, the opposition mentions *Gorman* only once in passing and summarily concludes it is "not instructive to this case." Opp. 8. Not so. *Gorman* recognizes that "schools must have considerable latitude to formulate their own rules to accomplish their academic and educational objectives" and that "absent a violation of law or public policy, it is not within the province of the court to inject itself in the rule-making authority of a private school." 853 A.2d at 37. The same principle underlies related precedents prohibiting claims for educational malpractice. *See e.g.*, *Ambrose v. New England Ass'n of Sch. & Colleges, Inc.*, 252 F.3d 488, 499 (1st Cir. 2001) (applying Maine law and collecting cases) (recognizing "the patent undesirability of having courts attempt to assess the efficacy of the operations of academic institutions"). And these principles apply *a fortiori* in the university context given academic freedom concerns. *Schaer v. Brandeis Univ.*, 735 N.E.2d 373, 381 (Mass. 2000) (adhering "to the principle that '[c]ourts are chary about interfering with academic and disciplinary decisions made by private colleges and universities.'").

Plaintiff similarly errs in arguing (Opp. 10) that his claims are not barred by educational malpractice precedents because he "is not suing because he claims he received a lower quality or inferior education" but instead was deprived of an "on-campus educational experience with multiple appurtenant benefits."  This argument misrepresents both the Amended Complaint and the governing law.

*First*, the Amended Complaint plainly asks this Court to determine that remote instruction by the same professors, in the same courses, with the same class materials, allowing uninterrupted progress towards academic credit, comprised "a materially different product, which deprived" students "of the benefit of the bargain for which they had already paid."  Am. Compl. ¶ 133, 135.  Plaintiff challenges both the mode and quality of instruction by alleging lectures were too short, "pre-recorded," lacking video recordings, or "simply posted for self-study completion."  *Id.* ¶ 29.  Plaintiff also suggests the remote learning he received is akin to the online programming traditionally offered by RWU.[1]  *Id.* ¶¶ 20-25.  These allegations, by their very nature, cannot be litigated without qualitative and comparative assessment of lectures, assignments, exams, seminars, and the classroom performance of students and professors.  Such inquiries are impermissible because they are properly reserved for professional educators.  *Ambrose*, 252 F.3d at 497 (holding impermissible a claim that "invite[d] [the Court] to substitute [its] judgment for that of professional educators" by assessing whether a college "offered an appropriate curriculum, helped to assure graduates of opportunities in the job market, and possessed institutional integrity"); *Gillis v. Principia Corp.*, 832 F.3d 865, 872 (8th Cir. 2016) (applying Missouri law) ("A breach-of-contract claim that raises questions concerning the

---

[1]   The Opposition contends RWU's traditional online offerings "contain the same curricula and faculty as the on-campus programs" (Opp. 3 (citing Am. Compl. ¶ 22)), but this allegation does not appear in the cited paragraph or elsewhere in the Amended Complaint.

reasonableness of the educator's conduct in providing educational services ... is one of educational malpractice, which Missouri courts have recognized as a non-cognizable claim.").

*Second*, although educational malpractice precedents bar challenges to the quality of education, they also more broadly preclude judicial evaluation of academic decisions and programs offered by universities.  For example, in *Gally v. Columbia University*, 22 F. Supp. 2d 199 (S.D.N.Y. 1998), a case relied upon by plaintiff (Opp. 8), a student sued her university for failing to address concerns about cheating by her classmates.  *Id.* at 207.  The student's breach of contract claim was dismissed because it "would require the Court to engage in an evaluation of the process of learning and school administration," an inquiry that was barred by educational malpractice precedents.  *Id.* ("The decision as to whether a student has complied with those [academic] standards and procedures is best 'left to the sound judgment of the professional educators.'").[2]  "[M]atters of academic judgment are generally better left to the educational institutions than to the judiciary and [courts] have accorded great deference where such matters are at issue."  *Haddad v. Bryant Univ.*, No. CV 18-314-JJM-PAS, 2019 WL 3084352, at *4 (D.R.I. July 15, 2019).

Of course not every claim against a university implicates educational malpractice; RWU never suggested as much.  In contrast to his own claims, plaintiff's authorities (Opp. 9) illustrate the limited types of specific, non-academic promises that can properly support a claim for breach of contract against a university.  For example, where a university fails to provide any instruction at all, students may have valid contract claims. *Zumbrun v. Univ. of S. Cal.*, 101 Cal. Rptr. 499,

---

[2]  Plaintiff selectively quotes *Gally* to suggest (Opp. 8) that educational malpractice claims only "sound[] in tort," but the sentence immediately preceding the one he cites explains that, when a plaintiff claims a university "breached its agreement by failing to provide an effective education, the complaint must be dismissed as an impermissible attempt to avoid the rule that there is no claim in New York for 'educational malpractice,'" 22 F. Supp. 2d at 207.

502 (Cal. Ct. App. 1972) (plaintiff's professor "refused to teach the class commencing on May 1, 1970 and refused to conduct a final examination despite [student's] written demand"); *Ross v. Creighton Univ.*, 957 F.2d 410, 417 (7th Cir. 1992) (applying Illinois law) (University "effectively cut[] [plaintiff] off from *any* participation in and benefit from the University's academic program" by failing to provide the "specific services" promised.).  By contrast, here there is no dispute that RWU continued to provide instruction in the same courses for the same credits as before the pandemic.  *See* Am. Compl. ¶ 29, 45.[3]  Plaintiff's remaining citations (Opp. 9) are similarly inapposite because they involve specific university promises and disciplinary matters distinct from academic discretion over curriculum.  *Johnson v. Schmitz*, 119 F. Supp. 2d 90, 96 (D. Conn. 2000) (applying Connecticut law) (To adjudicate student's allegations of academic theft, the court "recognize[d] that it may be required to evaluate the adequacy of policies designed to prevent misconduct; [but] this factor is capable of objective assessment."); *CenCor, Inc. v. Tolman*, 868 P.2d 396 (Colo. 1994) (rejecting claims that students "had not received the education they had been promised," but permitting claims based on university promises of "modern equipment in good working condition, qualified instructors, and computer training" that the university did not provide); *Kashmiri v. Regents of Univ. of California*, 67 Cal. Rptr. 3d 635, 648-49 (Cal. Ct. App. 2007) (university's "promise not to raise the PDF for continuing students was clear and explicit" and adjudicating whether university raised the fee "would not require an inquiry into the nuances of educational processes.").  In contrast to these cases, Simmons-Telep has not identified any specific and definite promises by RWU capable of

---

[3]  Plaintiff's contention (Opp. 16) that "Defendant here did not fail to provide *some* of what it promised, but failed to provide *any* of it" is flatly contradicted by his allegations in the Amended Complaint.  Am. Compl. ¶ 49 ("Defendant continued to offer some level of academic instruction via online learning"); ¶ 29 (Plaintiff's classes were "taught live over video conference during normal hours," "met once per week," and assignments were posted for "self-study completion.").

objective assessment, but instead alleges vague promises to "grant[ students] full rights and privileges of student status."  Am. Compl. ¶ 69.

### B.    The Academic Freedom Bar Applies

Plaintiff also fails to reconcile his claims with the First Amendment protections that guarantee universities discretion in the mode and manner of instruction.  Those interests would inevitably be infringed by adjudicating his claim that the remote learning he received was a "materially different product" than in-person instruction, and thereby deprived him of the value of the tuition he paid.  *Id*. ¶ 133.  Plaintiff contends (Opp. 11) that RWU's decision not to refund tuition and fees "is a standard commercial business decision, and one encountered by all market participants who take money in return for the promise to deliver services and/or products."  But Rhode Island recognizes universities have "unique qualities" that distinguish them from standard commercial businesses, and warrant different analysis.  *See Gorman*, 853 A.2d at 34.  Among those qualities is a university's freedom and discretion to determine how it will teach its curriculum.  *Sweezy v. New Hampshire*, 354 U.S. 234, 263 (1957) (Frankfurter, J., concurring in result) (The "four essential freedoms of a university" include deciding "what may be taught [and] how it shall be taught.").  Adjudicating the alleged material differences between in-person learning and remote learning would necessarily require the Court to "involve itself in the subjective professional judgments of trained educators," *Gally*, 22 F. Supp. 2d at 207, and to "substitute [its] judgment for that of professional educators" regarding the academic efficacy of RWU's instructional offerings, *Ambrose*, 22 F.3d at 497.

Accordingly, all plaintiff's claims warrant dismissal at the threshold.

II.   **SIMMONS-TELEP FAILS TO OVERCOME THE LEGAL DEFICIENCIES IN HIS CONTRACT CLAIMS**

Even if the Court declines to dismiss plaintiff's claims on the grounds above, his contract claims fail to identify any specific contractual promise that RWU would provide a particular manner of instruction and services, regardless of the circumstances or risks involved.  Notably, plaintiff does not cite a single allegation in support of the contention (Opp. 14) that the "complaint is replete with quoted statements and promises from Defendant."   Although the Amended Complaint quotes various statements from the University's website, catalog, and publications, no such language suggests a promise to provide in-person academic instruction.

A.   **Simmons-Telep Fails To Allege Any Contract Term Requiring Exclusively In-Person Education**

A contract plaintiff must "explain what obligations were imposed on each of the parties by the alleged contract . . . . Conclusory statements that '[defendants] . . . failed to keep their contractual requirement,' are insufficient to satisfy pleading requirements." *Doyle v. Hasbro, Inc.*, 103 F.3d 186, 195 (1st Cir. 1996) (applying Massachusetts law).  Although the relationship between students and universities may be contractual in nature, *Gorman*, 853 A.2d at 34, "vague and generalized representations are not contractually enforceable," *G. v. Fay Sch.*, 931 F.3d 1, 12 (1st Cir. 2019) (applying Massachusetts law) (statements in student handbook that a school would "help or work with students in need" were "not sufficiently definite statements to form a contract."); *see Turcott v. Gilbane Bldg. Co.*, 179 A.2d 491, 493 (R.I. 1962) (affirming demurrer to claim that employee was promised "a fair and equitable share of the profits, fees and earnings of the respondent corporation resulting from Complainant's efforts" because they "were too vague, indefinite, ambiguous, and insufficient to form" a contract).

7

Plaintiff errs in contending (Opp. 16) that it would be "absurd" to require he allege a promise for exclusively in-person instruction and services in all circumstances.[4]  To the contrary, even notice pleading requires a plaintiff to identify a contractual promise that would entitle him to the performance he claims was denied.  As a Massachusetts district court recently held in dismissing similar contract claims against Northeastern University, "marketing materials emphasizing 'in-person experiences' . . . as well as a few cursory descriptions on the university's website of the differences between classroom courses and online courses . . . [do] not give [the university] any definite notice of the derivation of the alleged contractual right to in-person instruction." *Bahrani v. Northeastern Univ.*, Case No. 1:20-cv-10946, Dkt. 39 (D. Mass Nov. 6, 2020) (applying Massachusetts law).[5]  The same is true here.

Plaintiff fares no better in pointing (Opp. 15) to vague and generalized statements from the academic catalog describing the University as "a forward-thinking private university with more than 40 undergraduate majors" (Am. Compl. ¶ 78), and describing "Life at Roger Williams" as entailing "a vibrant educational community in which the exchange of ideas occurs both inside and outside the classroom" (*id.* ¶ 79).  *See also id.* ¶ 88 (student handbook describing RWU "as a residential University, [that] places emphasis on the development of the whole

---

[4]   There is nothing "absurd" about requiring plaintiff to plead that his expectations were reasonable (and tethered to some contractual undertaking) under the actual circumstances that prompted interruption of in-person classes.  For example, if plaintiff had sued due to a University closure for a different safety reason (a bomb threat; a hazardous chemical spill; an active shooter, etc.) it would be unremarkable to require him to allege not merely a general expectation of in-person classes but rather a reasonable expectation the University would continue to provide such instruction *under those circumstances*.

[5]   Plaintiff contends (Opp. 18) the nature of the contract in *Chong v. Northeastern University*, 2020 WL 5847626, (D. Mass. Oct. 1, 2020) distinguishes the holding there from this case; however, *Bahrani*, issued by the same court that dismissed in *Chong*, was also dismissed for failure to allege a contractual promise for in-person education purportedly implied by various marketing materials, *see* Case No. 1:20-cv-10946, Dkt. 39—the same grounds urged here.

student and creates opportunities for them to encounter and appreciate values and lifestyles different from their own"). These statements are not promises. Rather, such language reflects the very "sort of generalized, aspirational statements that are insufficiently definite to form a contract." *Fay Sch.*, 931 F.3d at 12; *see also Ward v. New York Univ.*, 2000 WL 1448641, at *4 (S.D.N.Y. Sept. 28, 2000) (applying New York law) ("In order to state a claim for breach of such a contract, a student must identify 'specifically designated and discrete promises'"); *David v. Neumann Univ.*, 177 F. Supp. 3d 920, 925 (E.D. Pa. 2016) ("While Pennsylvania law allows a student to sue a private university for breach of contract, 'the allegations must relate to a specific and identifiable promise that the school failed to honor.'") (quoting *Vurimindi v. Fuqua Sch. of Bus.*, 435 Fed.Appx. 129, 133 (3d Cir. 2011)). But even if the statements were contractually enforceable promises (they are not), they do not promise in-person instruction. Whether remote or in-person, RWU continues to be a "forward-thinking" institution that emphasizes "development of the whole student." There is no plausible interpretation of these statements that would preclude remote learning and services under any circumstances—particularly during a global health crisis.

The same analysis applies to promotional statements on the University's website. Although plaintiff contends (Opp. 15) the University failed to show that statements appearing on its website *cannot* form a contract, plaintiff ultimately bears the burden to assert a cognizable contract claim, *cf. Gorman*, 853 A.2d at 37 (trial court "improperly placed the burden of proof on defendant, Saint Raphael, to justify its hair-code policy" where "the burden of proof in a breach of contract action rests with a plaintiff"). But even if statements on a university's website could form a contract, these statements are likewise insufficiently definite to be enforceable and do not promise in-person education. Descriptions of orientation events where students can "make

friends" (Am. Compl. ¶ 111) and "numerous photos of students interacting and studying on campus" (*id*. ¶ 90) are neither promissory nor relevant in any way to academic instruction or student services.

Plaintiff also cannot support his claims by asserting (Opp. 14) supposed differences between the University's "on-campus and online programs." *See also* Am. Compl. ¶¶ 19-25. Plaintiff's own allegations demonstrate that the University's online program offers limited degrees (*id*. ¶ 24) and has no set class meetings (*id*. ¶ 22). These differences distinguish the University's online programming from both traditional in-person classes and the remote learning provided in the Spring 2020 semester (*id*. ¶ 29 (one course offered "during normal hours" and another "met once per week")). Plaintiff does not and cannot allege that the same degree he was pursuing was available through the University's online programming at a discounted price.[6] Accordingly, these allegations do not give rise to any plausible inference that the University promised to forego all remote instruction for the program in which plaintiff enrolled. Moreover, as discussed above (Section I.A) any qualitative comparison of RWU's online programming to the remote learning provided in the Spring semester would be precluded under *Gorman* and comparable educational malpractice precedents.

Because Simmons-Telep has failed to identify any University promise that supports the performance he claims he was due, his contract claim fails as a matter of law.

---

[6]    Plaintiff incorrectly asserts(Opp. 3) that RWU's online programming is "offered at a significantly reduced price." In fact, online program students who enroll in full-time coursework are charged the same tuition as in-person programs. RWU, Tuition & Fees, *available at* https://www.rwu.edu/uc/admissions/tuition-fees ("A UC [University College] student taking 15 or more credits is charged the full-time day rate of $18,972.").

**B.      Undefined "Experiences" Are Too Vague To Form The Basis Of A Contract**

Plaintiff likewise fails in his repeated contentions (*e.g.*, Opp. 4, 10, 11, 15, 16) that he was denied "an on-campus educational experience."  Notably, this newly-minted phrase does not appear anywhere in the Amended Complaint.  Instead, plaintiff's Complaint alleged he was denied "in-person instruction" (Am. Compl. ¶¶ 69, 121, 122, 136) and unspecified services (*id.* ¶¶ 131, 135, 145, 170).  Plaintiff now purports to disavow any challenge to academic instruction (Opp. 11), in favor of complaining he was denied an "experience" that he characterizes as "a distinctly non-academic thing."  This contrivance of course serves only to move plaintiff *further* from a well-stated contract claim, because whatever aspirational "experience" or "thing" plaintiff has in mind is self-evidently too indefinite and ambiguous to form a contract (or give rise to claims under any theory).  *Turcott*, 179 A.2d at 493.

Terms of a contract must be sufficiently certain to "provide a basis for determining the existence of a breach and for giving an appropriate remedy."  Restatement (Second) of Contracts § 33(2) (1981).  The statements in the Amended Complaint from various University sources related to "experiences" do not meet this threshold standard.  For example, plaintiff identifies the website statement that "The Roger Williams experience calls you to live and interact competently in communities beyond yourself and work together towards the common good."  Am. Compl. ¶ 92; *see also id*. ¶ 18 (University's core values include a "commit[ment] to an expansive student-centered experience, characterized by academic rigor, critical thinking, collaboration and community engagement, that enriches students, the University and the broader society.").  There is no standard to adjudicate whether plaintiff was or was not actually called "to

live and interact competently in communities beyond" himself.[7]  *See Fay Sch.*, 931 F.3d at 12; *see also Jacobowitz on behalf of MJ v. YMCA of Greater Providence Bayside YMCA Branch,* No. CV 15-345 S, 2016 WL 1259397, at *4 (D.R.I. Mar. 30, 2016) (applying Rhode Island law) (YMCA's "mission statement [was] not a contract" because it provided no specific terms that could be considered binding) (citing *Vurimindi*, 435 Fed.Appx. at 133-34).  Nor should this Court undertake to determine how to appropriately compensate plaintiff for an alleged lack of "competent interaction in communities."  Accordingly, plaintiff's reliance on a purported "on-campus educational experience" cannot support his claim for breach of contract.

### C.    Simmons-Telep Fails To Allege Any Facts That Would Support A Reasonable Expectation Of In-Person Education During A Pandemic

Plaintiff's opposition further ignores that, when interpreting contractual terms governing a student-university relationship, courts apply a standard of "reasonable expectation—what meaning the party making the manifestation, the university, should reasonably expect the other party to give it."  *Mangla v. Brown Univ.*, 135 F.3d 80, 83 (1st Cir. 1998) (applying Rhode Island law) (quoting *Lyons v. Salve Regina Coll.*, 565 F.2d 200, 202 (1st Cir. 1977)).  Thus, the relevant question here is whether the University should have reasonably expected students to believe they would receive in-person education and services without regard to exigent circumstances—here a global pandemic and government orders requiring social distancing and capacity limits for gatherings in the Spring of 2020.[8]  The answer is clearly no.  From the University's perspective (and even from the student perspective), the reasonable expectation

---

[7]    There should be no dispute, however, that facilitating compliance with government safety mandates and best practices for protecting community health in light of a pandemic—which the shift to remote learning accomplished—constituted "work[ing] together towards the common good" as a matter of law.

[8]    Plaintiff raises and attempts to counter (Opp. 17) a frustration of purpose defense that defendant never argued in its motion to dismiss.

should have been that the University would adhere to government mandates and good practices for community health and safety, and would offer the academically suitable substitute methods of instruction reasonably available within those constraints.   There is no dispute that the University met this expectation at all times.

Plaintiff urges the Court (Opp. 16) to *disregard* the context in which the University transitioned to remote learning, a position that strips any meaning to the qualifier of "reasonable" expectations inherent in the standard.  To the contrary, courts should and do consider the impact of transient circumstances in assessing universities' obligations to their students.  *See, e.g.*, *Cuesnongle v. Ramos*, 713 F.2d 881, 882-83 (1st Cir. 1983) (applying Puerto Rico law) (rejecting breach of contract based on course cancellations and limits on instructors due to labor issues); *Roe v. Loyola Univ. New Orleans*, No. 07–1828, 2007 WL 4219174, at *2 (E.D. La. Nov. 26, 2007) (applying Louisiana law) (dismissing claims seeking refund of tuition after university rearranged instruction at a *different* school and by *different* professors in the wake of Hurricane Katrina); *Paynter v. New York Univ.*, 319 N.Y.S.2d 893, 894 (1971) ("In light of the events on [NYU's] campus," university was justified in suspending classes without refunding tuition following anti-war protests on campus.).

This common sense result is reinforced here by express cautionary language in the University's academic catalog, which notifies students of possible changes and thus renders unreasonable as a matter of law the unqualified subjective expectations that underlie plaintiff's claims.   Dkt. 23-1 ("reserv[ing] the right to modify the requirements for admission and graduation, to change the program of study, to amend any regulation affecting the student body"); Dkt. 23-2 ("reserv[ing] the right to cancel or limit enrollment in any class and . . . not guarantee[ing] course registrations, assignment of instructors, locations, or meeting times.").

13

Plaintiff "does not dispute Defendant's right to make" the changes described in the academic catalog, but contends without support (Opp. 19) that the disclaimers could apply only at the beginning of a school year or "perhaps . . . the beginning of a semester[.]" Not so. The catalog reserved the right to change academic programming "*at any time*" if "deemed by the University to be in the best interest of the University or [its] students to do so." Dkt. 23-1 at 3. Moreover, plaintiff's contention (Opp. 21) that the disclaimers "would be barred by traditional contract law" is inapposite in the student-university relationship, which does "not require strict adherence to contract law" but rather "leaves the school administration broad discretion" to protect the school's "right to modify . . . academic rules and regulations." *Gorman*, 853 A.2d at 34. In any event, Rhode Island courts uphold and enforce contract terms reserving the unilateral right to modify any and all policies at any time. *D'Oliveira v. Rare Hosp. Int'l, Inc.*, 840 A.2d 538, 541 (R.I. 2004) (affirming summary judgment against employee's claims for severance benefits because employer "expressly reserved its right to amend the severance policy at any time and so informed plaintiff in the handbook"); *see also Hebert v. Vantage Travel Serv., Inc.*, 444 F. Supp. 3d 233, 245 (D. Mass. 2020) (applying Massachusetts law) (Luxury cruise company did not breach by providing alternate travel arrangements following mechanical failures because its contract reserved "the right to modify the itinerary, which right shall include the use of hotels and motor coaches where necessary.").

In *Cuesnongle*, the First Circuit explained the importance of similar disclaimers to a university's reasonable expectations. 712 F.2d at 885. There, the university's catalog "reserve[d] the right to revise or change rules, charges, fees, schedules, courses, requirements for degrees and any other regulations affecting students whenever considered necessary or desirable." *Id*. In light of such a disclaimer, the court admonished a Puerto Rican state agency

for failing to consider "how it was possible, given these provisions, that the University or the students involved could possibly have had a 'reasonable expectation' that the students had a contract right or any right to have classes start on time," as plaintiffs alleged.  *Id*.

Plaintiff has not identified any provision of the University's publications that under any reasonable interpretation requires in-person education or services.  But even if he had, the University's express cautionary disclosures reserving the right to modify academic programming could not lead any students to reasonably believe that they would receive in-person education and services under all circumstances, including a pandemic.

> **D.     The Deference Afforded Universities Concerning Methods of Instruction Should Inform Interpretation of Any Contract Here**

Even if RWU's broad discretion to accomplish its educational objectives, is not deemed an absolute bar to suit here, the fact that "private schools must have considerable latitude to formulate and enforce their own rules to accomplish their academic and educational objectives," *Gorman*, 853 A.2d at 39, should inform construction of any implied contract here.  At a minimum, education contracts must be construed "in a manner that leaves the school administration broad discretion to meet its educational and doctrinal responsibilities."  *Id*. at 34. Here, the University was forced to respond to a global pandemic by reducing or eliminating in-person gatherings and therefore made the inherently academic decision to transition all classes to remote learning to meet its educational responsibilities and objectives.

Thus, even if plaintiff had adequately alleged a contractual promise of in-person education (he has not), the Court should interpret that promise in light of the University's academic discretion to provide instructional alternatives it deems academically equivalent (or reasonable substitutes) in response to unforeseen disruption of traditional academic offerings.

*See, e.g.*, *Loyola Univ. New Orleans*, 2007 WL 4219174, at *2; *Paynter*, 319 N.Y.S.2d at 894. Any arguable contractual undertaking to provide in-person education should be interpreted to permit the University flexibility to modify academic offerings as guided by its academic judgment. *Driscoll v. Bryant Univ.*, 393 F. Supp. 3d 153, 157 (D.R.I. 2019) (McConnell, J.) ("Matters of academic judgment are generally better left to the educational institutions than to the judiciary and courts have accorded great deference where such matters are at issue.") (quoting *Mangla*, 135 F.3d at 84).

## III.   SIMMONS-TELEP FAILS TO OVERCOME THE DEFICIENCIES IN HIS UNJUST ENRICHMENT CLAIMS

Plaintiff's opposition also fails to sustain his claims for unjust enrichment. *First,* plaintiff undercuts his unjust enrichment claim by contending the parties' relationship is contractual based on purported terms in University publications. *Driscoll*, 393 F. Supp. 3d at 157 ("Rhode Island law makes it clear that the relationship between a student and a private school is contractual. It is well established that the student handbook contains the student-school contract."). Where, as here, the terms of a contract embody the relationship between parties, unjust enrichment claims are generally impermissible. *Pickett v. Ditech Fin., LLC*, 322 F. Supp. 3d 287, 293 (D.R.I. 2018) (McConnell, J.) (applying Rhode Island law) (dismissing unjust enrichment claim because, where "there exists an express contract between the parties, equitable doctrines such as unjust enrichment are unavailable"); *see also* Restatement (Third) of Restitution and Unjust Enrichment § 2 (2011) ("Restitution is . . . subordinate to contract as an organizing principle of private relationships, and the terms of an enforceable agreement normally displace any claim of unjust enrichment within their reach.").

16

Plaintiff misplaces reliance (Opp. 22) on *Half Moon Ventures, LLC v. Energy Development Partners, LLC* to argue that his unjust enrichment claim is proper because the contract was "breached, voidable, unclear, or otherwise flawed," No. CV 18-685-JJM-PAS, 2019 WL 2176308, at *5 (D.R.I. May 20, 2019) (McConnell, J.).   In that case, a development company and investors entered into three separate contracts with an alleged oral modification governing investments in multiple infrastructure projects and, when read together, the agreements were "murky" and "not clear."   *Id.* at *5.   Here, although the provisions of the contract do not support plaintiff's claims, they are not unclear or otherwise flawed, and plaintiff does not contend otherwise.   And for the reasons discussed above, the contract was not breached.

*Second*, plaintiff errs in contending (Opp. 23) that it is a question of fact whether he has plausibly alleged circumstances under which it would be unjust for RWU to retain the tuition and fees it received in exchange for an education.   To the contrary, courts may properly dismiss unjust enrichment claims for failure to allege inequitable or unjust circumstances.   *See J.P. Morgan Chase Bank, N.A. v. Leigh*, No. CA 11-246ML, 2011 WL 4351584, at *2 (D.R.I. Aug. 23, 2011) (applying Rhode Island law) (dismissing unjust enrichment claim where plaintiff's "allegations do not plead any circumstances which could reasonably be construed as unjust or inequitable."), *report and recommendation adopted*, No. CA 11-246 ML, 2011 WL 4351561 (D.R.I. Sept. 15, 2011).   Here, plaintiff concedes he continued to receive academic instruction in classes taught by the same professors while making uninterrupted progress towards his degree.   *See* Am. Compl. ¶¶ 29, 45.   Courts have dismissed unjust enrichment claims even where students were expelled mid-semester and denied academic credit, or received instruction from an entirely different school.   *See, e.g., Loyola Univ. New Orleans*, 2007 WL 4219174, at *2-3 (dismissing unjust enrichment claims where the university rearranged instruction at a different school and by

different professors in the wake of Hurricane Katrina); *Zinter v. Univ. of Minnesota,* 799 N.W.2d 243, 247 (Minn. App. 2011) (affirming trial court's dismissal of unjust enrichment claim because the university "provided appellant with the instruction for which she paid"); *Bleiler v. Coll. of Holy Cross*, No. 11-11541-DJC, 2013 WL 4714340, at *18 (D. Mass. Aug. 26, 2013) (applying Massachusetts law) (rejecting expelled student's unjust enrichment claim based on lack of refund for tuition because the student "paid for and received an education [and] academic credit"). Plaintiff's claim here that the University somehow unjustly retained a benefit is more obviously unsustainable because he continued to receive his educational instruction and credit.  Therefore, his unjust enrichment claims should fail.

*Finally*, plaintiff cannot draw persuasive support from *Rosado v. Barry University* and the Florida district court's explanation that a tuition refund case "is kind of like purchasing a Cadillac at full price and receiving an Oldsmobile."   No. 1:20-CV-21813-JEM, 2020 WL 6438684 at *7 (S.D. Fla. Oct. 30, 2020).   Indeed, recognizing the "unique qualities" of the student-university relationship, *Gorman*, 853 A.2d at 34, the First Circuit has explicitly rejected analogies comparing academic responsibilities to commercial contracts.  *Cuesnongle*, 713 F.2d at 884-85 (By ordering a refund of student fees a Puerto Rican state agency "ha[d] taken the large step of supervising the conduct of basic university affairs by determining that [Universidad Central de Bayamon] has broken a highly complex relationship and agreement with its students as if it were a simple commercial contract to build a house.  It is far from that.").  Comparing the University's academic programs to an Oldsmobile is inapt under Rhode Island law, as is making qualitative comparisons of academic offerings within a university as if they were widgets or other commercial goods.

## <u>CONCLUSION</u>

For the reasons stated, this Court should dismiss plaintiff's First Amended Complaint.

DATED:  November 23, 2020                    Respectfully submitted,


By */s/ Robert C. Corrente*
Robert Clark Corrente (#2632)
Christopher N. Dawson (#8508)
Staci Kolb (#5451)
WHELAN CORRENTE & FLANDERS LLP
100 Westminster Street, Suite 710
Providence, RI 02903
Tel. (401) 270-4500
rcorrente@whelancorrente.com
cdawson@whelancorrente.com
skolb@whelancorrente.com

Kathleen M. Sullivan (*pro hac vice*)
Shon Morgan (*pro hac vice*)
Crystal Nix-Hines (*pro hac vice*)
T. Scott Mills (*pro hac vice*)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone:     (213) 443-3000
Facsimile:     (213) 443-3100
kathleensullivan@quinnemanuel.com
shonmorgan@quinnemanuel.com
crystalnixhines@quinnemanuel.com
scottmills@quinnemanuel.com

*Attorneys for Defendant,*
*Roger Williams University*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing Reply In Support of Roger Williams University's Motion to Dismiss was served on all counsel of record on November 23, 2020, using the Court's CM/ECF system, which will send a notification of such filing.

*/s/ Robert C. Corrente*
Robert C. Corrente